**WO**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No.   CR 24-09257-TUC-AMM(EJM) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Sterling Lee Runyon, | |
| Defendant. | |

Pending before the Court is a Motion to Suppress filed by counsel for defendant Sterling Lee Runyon.  (Doc. 47.)  The defendant argues that suppression of the evidence seized after the stop of his vehicle is warranted because the Border Patrol Agent did not have a reasonable suspicion to conduct the stop.  For the reasons discussed below, the Court recommends that the motion be denied.

## I.   FACTUAL BACKGROUND

The defendant is charged in a three-count indictment with the following offenses: Conspiracy to Transport Illegal Aliens for profit (Count 1) and Transportation of Illegal Aliens for Profit (Counts 2-3).  (Doc. 33.)

On April 1, 2025, the defense filed a Motion to Suppress evidence seized during a traffic stop which was not supported by a reasonable suspicion of criminal activity.  (Doc. 47.)  The defense argues that the totality of circumstances the court must consider in assessing whether there was reasonable suspicion that "must include not only what the officer observed and reported, but also importantly what the officer did not observe and report."  (*Id*. at 5.)  In the case at hand, there was "no recent activation of any foot sensors"

reported which "would have indicated the presence of suspected illegal aliens in the vicinity." (*Id.*). Additionally, "[n]one of the mobile surveillance camera operators had seen any suspicious activity," such as the defendant's "vehicle driving into the area and quickly turning around" or the defendant's "vehicle picking up any suspected aliens." (*Id.*). The only thing that the Border Patrol agent knew at the time he stopped the defendant's vehicle was that "the vehicle was from Phoenix, that it had its seats folded down, and that it was carrying a load in the back." (*Id.* at 6.)   These facts only suggest that the defendant's vehicle "was being used to transport something" — *e.g.*, "a piece of furniture such as an armoire"- which does not rise to the level of reasonable suspicion that a criminal offense was being committed. (*Id.*)

The government argues that the experienced Border Patrol agent had ample reasonable suspicion to perform the traffic stop based on the following facts. (Doc. 50.) First, the characteristics of the area where the stop occurred – *i.e.,* the proximity to the border and prior alien smuggling activity in the area. (*Id.* at 4.) Second, the state route where the stop occurred is a known corridor for alien smuggling. (*Id.*) Third, the stop occurred during a shift-change for Border Patrol agents which results in low staffing for periods of time. (*Id.* at 5.) Fourth, the Border Patrol checkpoint was closed which increases smuggling activity. (*Id.* at 4.) Fifth, the stop occurred on a Saturday and there is an increase in alien smuggling on weekends. (*Id.*) Sixth, the defendant was driving a minivan, which is a common vehicle used to transport illegal aliens because the rear seats can be easily folded down to conceal aliens from law enforcement. (*Id*. at 5.) Seventh, the rear seats in the minivan appeared to be folded down and the agent could only see the driver and front passenger. (*Id.*) Eighth, the minivan had a temporary license plate which is common for vehicles used to smuggle aliens. (*Id.*) Ninth, the minivan appeared to be carrying a heavy load because the rear of the van was riding lower than the front and it was excessively bouncing when riding over bumps on the road. (*Id.*)

The Court held an evidentiary hearing on the suppression motion on May 12, 2025. The following witnesses testified at the hearing: (1) Border Patrol Agent Jesse Berry and

(2) Sterling Runyon.  Their testimony is set forth below.

### A. Testimony of Agent Jesse Berry

1. <u>Direct Examination</u>

Jesse Berry has been a Border Patrol agent for approximately eighteen years.  (Hr'g. Tr. 5/12/25 (Doc. 62) at 5.)  He has been working at the Wilcox station "[o]n and off" for about nine years.  (*Id.* at 7.)   He is currently a K-9 handler at the Wilcox station and is either assigned to the Border Patrol checkpoint or traffic observation.  (*Id.*)

Agent Berry was a mechanic for six years prior to becoming a Border Patrol agent.  (*Id.* at 8.)  His experience as a mechanic helps him at the checkpoints when searching vehicles.  (*Id.*)  He can spot the way a vehicle drives, how the vehicle is handling, and the way the vehicle is "riding."  (*Id.* at 9.)

When Agent Berry started with the Border Patrol, he attended the Border Patrol training academy for several months.  (Hr'g. Tr. 5/12/25 (Doc. 62) at 5.)  He received training in use of force, physical apprehensions, vehicle stops, immigration law (*e.g.*, illegal entry and alien smuggling) and Spanish.  (*Id.* at 5-6.) After he completed the academy, he received field training from experienced agents for several months.  That training included how to conduct traffic stops and common trends of alien smuggling.  (*Id.* at 6-7.)  Specifically, he was instructed on "how to identify and spot things that would" be indicative of alien smuggling – *e.g.*, vehicles "riding heavy," dark tint on a vehicle, temporary tags, newly purchased vehicles, rental vehicles, drivers acting nervous while driving, routes taken, and times of day when suspected load vehicles travel.  (*Id.* at 7.)

The Wilcox area of responsibility ("AOR") extends north to Sanford, Arizona, east to the New Mexico State line, west to Marsh Station near Interstate 10, and south to the Border Patrol stations in Douglas, Naco, and Sonoita.  (*Id.* at 8.)  The Wilcox AOR includes Whetstone, Arizona and State Route ("SR") 90.  (Hr'g. Tr. 5/12/25 (Doc. 62) at 9.)  Whetstone is a small rural community with a few shops and restaurants.  (*Id.* at 20.)  There are primarily neighborhoods north of Whetstone up to where the checkpoint is located.  (*Id.*)  The area north of the checkpoint is primarily desert until Kartcher Caverns and then

there are a few more neighborhoods just south of Interstate 10. (*Id.*) There are truck stops and gas stations where SR 90 ends at Interstate 10. (*Id.*)

SR 90 is a north/south road which runs from Interstate 10 near Benson, Arizona, and goes south through the towns of Whetstone, Huachuca City, and into Sierra Vista; it then curves to the east and ends at SR 80. (Hr'g. Tr. 5/12/25 (Doc. 62) at 9.) If you continue to head south instead of east onto SR 80, what was SR 90 becomes Buffalo Soldier Trail and later becomes SR 92, which leads to a border area. (*Id.*)

There is more traffic on SR 90 on weekdays because there are military personnel traveling to and from the Fort Huachuca base. (*Id.* at 13.) Traffic on SR 90 on weekends is "consistent and sporadic." (*Id.*) Families pass through that area and people are doing weekend chores; there is also a lot of traffic in and out of a Dollar General store in Whetstone, Arizona. (*Id.*) Alien smuggling activity tends to "pick up" on the weekends. (Hr'g. Tr. 5/12/25 (Doc. 62) at 14.) Agent Berry has had more seizures and arrests on the weekends, which he attributes to load drivers coming from Phoenix who work real jobs Monday to Friday. (*Id.*)

SR 90 is commonly patrolled by Border Patrol agents because it is a common route used by human smugglers and undocumented people. (*Id.* 10.) SR 90 allows access to Interstate 10 from border areas. (*Id.*) SR 90 goes through remote areas and has access roads from Douglas, Naco, Sonoita and Nogales, which are all common areas for human smuggling and individuals who cross the border unlawfully. (*Id.* at 10-11.) There is a permanent Border Patrol checkpoint on SR 90 just south of mile marker 304. (Hr'g. Tr. 5/12/25 (Doc. 62) at 10.) Once a vehicle reaches Interstate 10 from a border area there are no immigration checkpoints; Interstate 10 leads to Tucson and Phoenix which are "central hubs for smuggling activities." (*Id.*)

When the Border Patrol checkpoint on SR 90 is operational, load drivers will drop off undocumented people south of the checkpoint and then have the people reenter the vehicle north of the checkpoint. (*Id.* at 11.) If the checkpoint is not operational, human smugglers will use any route that will allow them to travel north without inspection. (*Id.*)

1    SR 90 is one of the first routes that human smugglers are able to use to travel north.  (*Id.* at

2    11-12.)

3        It is common for Agent Berry to monitor radio transmission in Wilcox and other

4    AORs while on patrol.  (Hr'g. Tr. 5/12/25 (Doc. 62) at 12.)  He is able to listen to radio

5    transmissions from the Naco and Sonoita stations, as well as the Wilcox station.  (*Id.*)

6    Agent Berry listens to radio transmissions from these other stations because they are closer

7    to the border and they advise agents situated further north of the border about possible

8    vehicle loads headed north, or if agents are chasing a vehicle traveling northbound.  (*Id.*)

9        On Saturday December 7, 2024, Agent Berry was observing traffic on State Route

10   90 just north of the intersection of SR 90 and SR 82, which is about 28 miles from the

11   border.  (*Id.* at 13, 22.)  He was parked in the median of SR 90.  (*Id.* at 17.)  SR 82 is an

12   east/west road and it runs through "pretty open desert" with a few scattered houses along

13   the way.  (Hr'g. Tr. 5/12/25 (Doc. 62) at 21.)  If the checkpoint is not operational, it is more

14   common to see undocumented aliens in vehicles in this area because it is easier for a human

15   smuggler to travel north without inspection.  (*Id.* at 22-23.)  Agent Berry was on patrol

16   because the checkpoint was closed that day due to a staffing shortage.  (*Id.*)[1]

17       Agent Berry first saw the defendant's silver minivan traveling northbound on SR 90

18   at around 3:15 p.m., which was shortly after the 2:00 p.m. "shift change" for the Wilcox

19   Border Patrol agents.  (Hr'g. Tr. 5/12/25 (Doc. 62) at 24-26.)  Agent Berry was observing

20   northbound traffic because it was more likely that smugglers would be traveling

21   northbound from the border.  (*Id.* at 26.)  Because agents have to drive to/from the Wilcox

22   station to end/begin their shift, it takes about two hours after a shift change to have full

23   staffing in assigned patrol areas.   (*Id.* at 25.)   In Agent Berry's experience, load drivers

24   "utilize shift change hours to push vehicles through because they know the law

25   enforcement is at a lower presence during that time."  (*Id.*)  Additionally, minivans "are a

26   choice vehicle for smugglers because they can carry more load, more people or more

27   _____

28        [1] A checkpoint can also be closed due to inclement weather, traffic accidents, or other
     safety concerns for the general public.  (*Id.* at 23.).

narcotics." (*Id.*)

When the minivan passed Agent Berry's patrol vehicle, he saw "a white male driver and a black passenger, and the vehicle appeared to be a little bit lower in the rear," which raised a suspicion that it may be "possibly carrying a heavy load." (Hr'g. Tr. 5/12/25 (Doc. 62) at 27.)  In assessing whether a vehicle is "driving low," Agent Berry looks at the spacing between the tire and the fender well.  (*Id.*)  "The space between rear tire and the fender was smaller than that of the space between the tire and the fender on the front" of the minivan. (*Id.*)  Agent Berry also noticed that the back portion of the minivan was kind of "sagging" and the back tires appeared to be squished, which occurs when "vehicles are heavily laden." (*Id.*)  Agent Berry also noticed that the minivan had a temporary paper plate. (*Id.* at 28.)  For these reasons, Agent Berry pulled his vehicle onto SR 90 to follow the minivan.  (Hr'g. Tr. 5/12/25 (Doc. 62) at 28.)

Agent Berry ran the license plate number through Tucson Sector radio dispatch and learned that the minivan "was registered to a used car company out of Phoenix" as well as "to a Mr. Washington, also out of Phoenix." (*Id.* at 29.)  The two different registrations indicated to Agent Berry that the minivan was "a newly purchased vehicle and the vehicle wasn't fully transferred to the owner yet." (*Id.*)  These facts raised Agent Berry's suspicion because it is common for load vehicles to be recently purchased from used car dealerships, and most of the load drivers that he arrests are from the Phoenix area. (*Id.* at 29-30.)

As Agent Berry followed the minivan he "saw it bouncing and swaying as it kind of went over bumps, and the vehicle would sag down," which suggested that "it was possibly carrying a heaving load." (*Id.* at 30.)   Agent Berry could see through the back window of the minivan "all the way out through the [front] windshield;" he saw "the two heads of the driver and passenger" and the rear bench seat. (Hr'g. Tr. 5/12/25 (Doc. 62) at 30.)  There appeared to be a "space between the bench seat up to the driver's seat where there would normally be middle seats." (*Id.*)  Agent Berry did not see heads of people in the rear seats or large objects in the back of the minivan which would have caused it to ride low. (*Id.* at 31.)  These facts further raised Agent Berry's suspicion because it is common

for seats in vans to be easily removed or laid down so more people or drugs can fit in "below the window line to avoid detection by law enforcement." (*Id.* at 30.)

Agent Berry performed a traffic stop on the minivan just north of the checkpoint near mile marker 304 on SR 90 and made contact with the driver who was the defendant. (*Id.* at 35-36.)  When he activated his emergency equipment to make the stop and "the van started to pull over to the side of the road, people then became visible sitting up from a position beneath the window line." (Hr'g. Tr. 5/12/25 (Doc. 62) at 43.)  As he came up alongside the driver's door, Agent Berry saw a person seated in one of the middle bucket seats and three people seated in the third-row bench seat. (*Id.*)  One of the middle bucket seats in the van was missing or had been removed. (*Id.* at 39.)  When Agent Berry was following the minivan, the other middle seat appeared to be laid down because he could only see the third row of seats; however, those seats appeared to be empty because but he could not see the heads of people in those seats. (*Id.* at 43.)  By the time Agent Berry arrived at the driver's door of the van, the middle row bucket seat was up and a person was seated in it. (*Id.*)  Again, the people in the van only sat up as the van was coming to a stop. (Hr'g. Tr. 5/12/25 (Doc. 62) at 44.)

## 2. Cross-Examination

Agent Berry was instructed at the Border Patrol Academy on how to write reports detailing the events that lead to an arrest. (*Id.* at 48.)  Because memory fades over time, one of the reasons to write a report is to help an agent remember things that happened a week, months, or even years later. (*Id.* at 48-49.)  It is best practice to include all relevant information, such as the basis for stopping a vehicle, in a report. (*Id.*)

The distance from the intersection of SR 90 and SR 82 and where Agent Berry made the traffic stop is approximately 3.6 miles. (*Id.* at 55.)  Agent Berry's report does not specify whether the minivan was traveling well below or above the posted speed limit. (Hr'g. Tr. 5/12/25 (Doc. 62) at 56.)  As a result, it is safe to assume that the minivan was traveling around the speed limit. (*Id.*)  Agent Berry estimates that he followed the minivan for about three minutes prior to initiating the traffic stop. (*Id.* at 57.)

The picture of the driver's side of the minivan shows that the space between the back tire and fender is smaller than the front tire and fender.  (*Id.* at 58.)  Agent Berry does not know if this picture was taken while the people were still in the minivan.  (*Id.*)  Agent Berry agreed with defense counsel that the minivan could have been "riding low" because it was "a crappy car having crappy suspension" or had bad shocks or struts.  (Hr'g. Tr. 5/12/25 (Doc. 62) at 59.)  However, Agent Berry disagreed with counsel that these factors would have caused to minivan "to be jumping[.]"  (*Id.*)  Based on his experience as a mechanic and a Border Patrol agent, the bounce that he observed was "more of a sag.  Bad suspension, bad shocks, would cause a car to bounce over bumps if it was not overweighted.  When a car is weighted down and it hits bumps, the car will sag and slowly come back to the ride height."  (*Id.*)  Since there did not appear to be people seated in the back of the van, the sagging suggested that the van was carrying a heavy load. (*Id.* at 63.)

Again, Agent Berry could see the rear bench seats and the driver's seats when he was following the minivan, but there was "a large open space up to the front seats where the driver and passenger were visible."  (*Id.* at 60-61.)   He saw people sit up in the back seat area as the van slowed down and pulled to the side of the road.  (Hr'g. Tr. 5/12/25 (Doc. 62) at 62.)

Agent Berry stopped the minivan, in part, because he believed "it was carrying a heavy load given that it was weighted down;" there did not appear to be a middle row of seats and there were no visible occupants in the rear portion of the minivan; it was sagging as it traveled over bumps in the road; and it had temporary tags registered out of Phoenix.  (*Id.* at 63-64.)  Agent Berry does not recall driving past the minivan in the left lane of traffic prior to getting behind the minivan.  (*Id.* at 84-85.)

Agent Berry first observed the minivan about ten miles northwest of Sierra Vista.  (*Id.* at 64.)  Stash houses operate in the towns surrounding Sierra Vista (*e.g.*, Hereford, Palominas, Naco, and Lochiel).  (*Id.* at 64-65.)  Because these areas are used by alien smugglers, the "Border Patrol focuses a fair amount of resources" — *e.g.*, foot sensors, fixed tower cameras, mobile surveillance cameras, license plate readers —  on that area.

(Hr'g. Tr. 5/12/25 (Doc. 62) at 65.)  Each Border Patrol station has a tactical operations center that operates this technology.  (*Id.* at 65-66.)  Agent Berry's report "does not document any foot sensors being tripped," any "cameras catching illegal alienates crossing the border or walking in the desert," or any camera or license plate reader catching the minivan "driving near the border" or at a stash house or known smuggling area where illegal aliens are picked up.  (*Id.* at 65.)  Agent Berry "was hearing camera traffic and sensors on the radio that day but nothing that specifically pointed out this van[.]". (*Id.* at 67.)

After the motion to suppress was filed on April 1, 2025, Agent Berry met with government counsel.  (*Id.*  at 68.)  The general focus of that meeting was to discuss the reasonable suspicion for the traffic stop. (Hr'g. Tr. 5/12/25 (Doc. 62) at 68.) After that meeting, Agent Berry drafted a supplemental report dated April 9, 2025, in which he added "additional information and context surrounding the reasonable suspicion[.]  (*Id.* at 68-70.) That report notes that the time and day of a smuggling event are important for two reasons: (1) alien smuggling increases during the hours surrounding shift change; and (2) Saturday and Sunday "have higher number of arrests and seizures due to the fact that most people work a Monday to Friday job and are free to engage on weekends in smuggling activities." (*Id.* at 70.)   Agent Berry did not include these two facts in his original report.  (*Id.*)  The importance of the days and time frame that alien smuggling most often occurs is based solely on Agent Berry's prior alien smuggling arrests.  (*Id.* at 72.)

### 3.  Re-Direct Examination

Agent Berry has made hundreds of arrests during his eighteen years as a Border Patrol agent.  (Hr'g. Tr. 5/12/25 (Doc. 62) at 74.)   Because he has made more alien smuggling arrests on weekends, the fact that the defendant was driving north on a weekend was one of many factors that he considered in making the traffic stop.  (*Id.* at 74-75.)  The facts that Agent Berry added to his supplemental report are factors he considered in making the traffic stop; he just neglected to include those facts in his original report.  (*Id.* at 75.)

Agent Berry again explained that he saw that the rear bench seats were up but he

could not see people sitting in them.  (*Id.* at 77.)  He saw "a void between the back seats and the driver and front passenger seats that appeared" to be empty, and he "could not see cargo or people in those areas, at least above the window line." (*Id.* at 77.)  It is common for seats in load vehicles to be "manipulated" and for illegal aliens to lay below the window lines to avoid detection by law enforcement.  (Hr'g. Tr. 5/12/25 (Doc. 62) at 77-78.)  As a result, these are factors that he considered when deciding to conduct the traffic stop.  (*Id.* at 77.)

The radio traffic about illegal aliens being apprehended or spotted in the desert was constant prior to the traffic stop.  (*Id.* at 81.)  The traffic about illegal aliens not yet apprehended was significant because it gave Agent Berry a "heads up" that he may encounter illegal alien smuggling activity at or near his location on SR 90.  (*Id.*)

Illegal aliens are also picked up by vehicles in areas that are not right by the border.  (*Id.*)  For example, there are stash houses within a few miles from the border as well as in Sierra Vista and surrounding towns.  (Hr'g. Tr. 5/12/25 (Doc. 62) at 82.)

**B.  Testimony of Sterling Runyon**

   1.  Direct Examination

Mr. Runyon testified that Agent Berry's vehicle "passed my vehicle in the left-hand lane, completely passed me, slowed down, got to the side of the vehicle, looked inside, peered inside for about 30-45 seconds, [and] slowed down behind the vehicle thereafter[.]". (*Id.* at 87.)  Mr. Runyon believes that Agent Berry was "running the license plate for a couple minutes" and then "lit the van up[.]" (*Id.*)  Mr. Runyon added that Agent Berry never got behind the minivan until after he turned on the emergency lights while in the left lane.  (*Id.* at 88.)  As Mr. Runyon turned on his turn signal to move into the left lane, Agent Berry activated his lights and then pulled behind the minivan.  (*Id.*)

   2.  Cross Examination

Agent Berry was driving a white Border Patrol truck with a back cover; he was wearing a military green Border Patrol uniform.  (Hr'g. Tr. 5/12/25 (Doc. 62) at 89.)  Mr. Runyon reiterated that as he was signaling to move to the left lane, Agent Berry turned on

his lights and pulled behind him in the right lane.  (*Id.* at 90.)  He also reiterated that Agent Berry passed his vehicle "going quite a bit over the speed limit, and he slowed down quite dramatically to look at . . . my vehicle[.]". (*Id.* at 91.)  Agent Berry got to the side of Mr. Runyon's vehicle, peered down into the vehicle, and then slowed down to run the license plate.  (*Id.* at 91.)[2]

### 3. Re-Direct Examination

Mr. Runyon testified that after Agent Berry noticed a white driver and a black passenger while pacing the minivan, he slowed down and turned on his emergency lights while still in the left lane.  (*Id.* at 92.)   Agent Berry then pulled into the right lane behind the minivan to perform the traffic stop.  (*Id.*)

## II.    DISCUSSION

Law enforcement officials may conduct a brief investigatory stop of a vehicle based on reasonable suspicion.  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  "Reasonable suspicion is defined as 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'"  *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (*quoting United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013)). Reasonable suspicion is less than probable cause and "falls considerably short of satisfying a preponderance of the evidence standard."  *Id.*  As a result, this standard "is not a particularly high threshold to reach."  *Valdes-Vega,* 738 F.3d at 1078.

"When reviewing an officer's reasonable suspicion, [a court] 'must look at the 'totality of the circumstances.'"  *Id.*   With respect to stops near the border, the totality of circumstances include: (1) the characteristics of the area; (2) the proximity to the border; (3) the usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver, including attempt to evade officers; (6) appearance or

---

[2] Even if Agent Berry was mistaken and did peer into the side of Mr. Runyon's vehicle, that fact is not pertinent to the reasonable suspicion analysis because Mr. Runyon did not testify about whether his rear passengers were seated upright, hunched over, or laying down.  Stated another way, the only evidence before the Court is that Agent Berry could not see any people above the window line in the rear of the minivan, regardless of whether he made that observation while driving behind or to the side of the minivan.

behavior of passengers; (7) model and appearance of the vehicle; and (8) officer experience.  *United States v. Garcia-Barron*, 116 F.3d 1305, 1307 (9th Cir. 1997).

"Not all of these factors must be present or highly probative in every case to justify reasonable suspicion." *Valdes-Vega*, 738 F.3d at 1079.  Moreover, the Supreme Court has held that courts should not engage in a "divide-and-conquer analysis" when reviewing the factors considered by law enforcement.  *Arvizu,* 534 at 274.  A court cannot review factors in isolation and give no weight to factors that individually might be susceptible to an innocent explanation.  *Id*.  Rather, a court must consider all the facts considering all of the circumstances.  *Id*.

Additionally, "the facts supporting reasonable suspicion must be filtered through the lens of the agents' training and experience." *Valdes-Vega*, 738 F.3d at 1079.    The Supreme Court had held that law enforcement officers are entitled to draw inferences and make deductions based on their training and experience.  *Arvizu*, 534 U.S. at 273. As a result, a court must give "due weight" to factual inferences drawn by law enforcement officers. *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

1.  Agent Berry's Training and Experience

There is no doubt that Agent Berry has significant experience investigating alien and drug smuggling activity.  He has been a Border Patrol agent for eighteen years and has made hundreds of alien smuggling arrests during his career.  As a result, he has learned the common behaviors and trends used by human smugglers.  Agent Berry is particularly familiar with the area on SR 90 where the stop occurred because he has worked in the Wilcox station's AOR for nine to ten years.  Additionally, Agent Berry's prior work as a mechanic provided him with a more sophisticated understanding of both the innocuous and nefarious reasons why the rear of a vehicle would "ride low."

Agent Berry's extensive experience with alien smuggling activity requires this Court to give "due weight" to the factual inferences and deductions that he drew when deciding to conduct the traffic stop.  Those inferences and deductions and the facts supporting them are discussed below.

2. <u>Proximity to the border, characteristics of the area, and prior alien smuggling in the area.</u>

The area where the stop occurred on SR 90, even though 28 miles from the border, is significant because it occurred near the northernmost checkpoint before SR 90 ends at Interstate 10. *See Valdes-Vega*, 738 F.3d at 1079 (stop that occurred at a checkpoint 70 miles north of the border was significant because it occurred at the last northernmost checkpoint). This permanent checkpoint is situated on SR 90 just north of SR 82 because this area is a known corridor for alien smuggling. Border Patrol agents commonly apprehended illegal aliens in vehicles traveling on SR 90. SR 90 is routinely used by alien smugglers because it provides direct access from border towns to Interstate 10, which provides a direct route to Tucson, Phoenix, and cities in the interior of the United States. SR 90 is fed by four border towns: Nogales, Naco, Sonoita and Douglas. In and around these border towns, it is more common to see illegal aliens on foot. Load drivers often pick up illegal aliens in remote areas of the desert near these towns to avoid detection by law enforcement; SR 90 provides access to these remote areas. Agent Berry has routinely encountered vehicles on SR 90 transporting illegal aliens who were picked up in remote areas closer to the border.[3]

3. <u>Usual patterns of traffic on the day and time when the stop occurred.</u>

The stop of the defendant's vehicle, which was registered to used car dealership in the Phoenix area, occurred on a Saturday which, based on Agent Berry's experience, was significant for two related reasons. First, there is more alien smuggling activity on weekends. Second, load car drivers are often from the Phoenix area who engage in smuggling activities on the weekends because they work regular jobs during the week.

---

[3] Defense counsel emphasizes that there was no recent activation of any foot sensors reported which would have indicated the presence of suspected illegal aliens in the vicinity; and no mobile surveillance camera operator had seen any suspicious activity, such as the defendant's vehicle picking up any suspected aliens. The absence of this evidence does not undercut or have any bearing on the many other facts and circumstances that provided reasonable suspicion for the stop. Neither sensors nor cameras can capture the entirety of the vast and remote Southern Arizona desert.

Additionally, Agent Berry encountered the defendant at 3:15 p.m., which was around the time of a shift change for the Wilcox Border Patrol agents. Agents working swing shift began work at 2:00 p.m. but agents have to drive from the Wilcox station to their assigned patrol areas. As a result, it takes about two hours after a shift change to have full staffing in assigned patrol areas. Agent Berry testified that alien smuggling organizations will exploit this time frame because there are less Border Patrol agents patrolling the roads.

The fact that the Border Patrol checkpoint was closed on December 7, 2024, was also significant to Agent Berry's suspicion of criminal activity. He testified that alien smuggling organizations will use scouts to find out if a checkpoint is closed, and if so, take advantage of the closure. As a result, there are more smuggling activity when the checkpoint is closed, which is why Agent Berry was patrolling near the closed checkpoint.

4. <u>The behavior of the driver and passengers and the appearance of the vehicle:</u>

Agent Berry did not notice any behavior by the driver or front seat passenger that raised his suspicion of criminal activity. However, the absence of any visible passengers or cargo in the back of the minivan was especially significant because the rear of the minivan was "riding low." Unlike the front tires, there was little space between the back tires and the wheel well and the back tires were bulging at the sides. Additionally, as he followed the minivan, Agent Berry noticed that the vehicle was excessively "sagging" as it went over bumps in the road. In Agent Berry's experience as a mechanic, a vehicle that had bad suspension, struts, or shocks would not be sagging in the rear; it would bounce when going over bumps in the road. These facts raised Agent Berry's suspicion of criminal activity because illegal aliens in a minivan tend to hide below the window line and a minivan with only front seat passengers should not have been riding low.

Additionally, Agent Berry testified that minivans are commonly used to smuggle aliens because they are spacious and capable of modifications, such as easily removing or folding down the rear seats to allow a large number of people to conceal themselves below the window line. Agent Berry suspected that this tactic was being used for the defendant's

minivan because the middle row of seats appeared to be folded down or removed given the large void between the front seats and back row seats.

Agent Berry also observed dirt and dust on the minivan's tires which suggested that it had been in a remote area of the desert.  He testified that it is common for load vehicles to drive into remote areas of the desert to load aliens to avoid detection by law enforcement.

Finally, the minivan had a temporary license plate which is common for vehicles used to transport illegal aliens.  The vehicle was registered to a used car dealership in the Phoenix area, while the temporary tag was registered to a person in Phoenix.  That dual registration is common for load vehicles because alien smuggling organizations commonly purchase the vehicle for the load driver immediately before the alien smuggling event.  As a result, a load vehicle will have a temporary license plate that is registered to the owner of the vehicle, but the vehicle is still registered to the car dealership because there is not enough time between the purchase and the smuggling event for title transfer to the purchaser.

## III.    CONCLUSION

The totality of the circumstances discussed above provided Agent Berry with a reasonable suspicion of criminal activity to lawfully stop the defendant's vehicle.  Again, those circumstances, viewed through the lens of Agent Berry's training and experience, include:  (1) the stop occurred in an area relatively close to the border; (2) the stop occurred on SR 90 just north of SR 82 which is a well-known corridor for alien smuggling; (3) the minivan had a temporary license plate which suggested that it had been recently purchased, which is a common tactic used by alien smuggling organizations; (4) the minivan was registered out of the Phoenix area, which is common for load vehicles; (5) the stop occurred over the weekend when there is an increase in alien smuggling activity, especially by load car drivers who reside in the Phoenix area; (6) the stop occurred during a shift-change for Border Patrol agents which results in low staffing for about two hours; (7) the Border Patrol checkpoint was closed which increases smuggling activity; (8) the defendant was driving a minivan which is a vehicle commonly used to smuggle illegal aliens because the middle

seats can be easily be removed or folded down to conceal aliens from law enforcement; (9) the middle seats in the defendant's minivan appeared to be removed or folded down and Agent Berry could only see the driver and front passenger above the window line; (10) the minivan appeared to be carrying a heavy load even though there were no visible back seat passengers; and (11) the dust and dirt on the tires was indicative of the minivan traveling on a dirt road to pick up illegal aliens in a remote area of the desert, which is common tactic used by load vehicles.

## IV.    RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Judge deny Defendant Sterling Runyon's Motion to Suppress (Doc. 47.)

Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  No reply shall be filed unless leave is granted from the District Court.  If objections are filed, the parties should use the following case number: **CR-24-09257-TUC-AMM.**

Failure to file timely objections to any factual or legal determination of the Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right of review.

Dated this 29th day of May, 2025.

Eric J. Markovich
United States Magistrate Judge